UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

| | | |
|---|---|---|
| In re | ) | |
| | ) | |
| ANNA AUGUST BOLING, | ) | Case No.  6:05-BK-16267-KSJ |
| | ) | Chapter 7 |
| Debtor | ) | |
| | ) | |
| In re | ) | |
| | ) | |
| RODERIC LEE BOLING, | ) | Case No.  6:05-BK-16271-KSJ |
| | ) | Chapter 7 |
| Debtor | ) | |
| | ) | |
| MONTE GREEN | ) | Lead Case Adv. No. 6:06-AP-00076 |
| | ) | |
| Plaintiff, | ) | Consolidated Adversary |
| vs. | ) | Proceedings: |
| | ) | |
| ANNA AUGUST BOLING, | ) | Adv. No. 6:06-AP-00077 |
| | ) | Adv. No. 6:06-AP-00114 |
| Defendant. | ) | Adv. No. 6:06-AP-00115 |
| | ) | Adv. Pro. 6:07-AP-00158 |
| | ) | Adv. Pro. 6:07-AP-00161 |
| | ) | |

MEMORANDUM OPINION
ON MOTIONS FOR RELIEF FROM STAY
AND CONSOLIDATED ADVERSARY PROCEEDINGS

Anna and Roderic Boling, a divorced couple, each filed separate Chapter 7 cases. Two weeks prior to the bankruptcy filings, Monte Green made a possibly usurious loan of $300,000 to these debtors.  Although the debtors signed mortgages encumbering their separate homes to secure the loan, Green failed to timely record the mortgages, recording them two days after the bankruptcy filings.  Green never received a single payment on the loan.

These simple facts have created a myriad of issues.  The debtors, in two separate adversary proceedings,[1] seek a determination that the loan is usurious and unenforceable.  Green,

---

[1] Adversary Proceedings Numbers 6-114 and 6-115.

in response, seeks, also in two separate adversary proceedings,[2] a determination that any debt due to him is not dischargeable. Green also requests a modification of the automatic stay[3] in order to obtain *nunc pro tunc* approval for the belated recording of his mortgages two days after the bankruptcy filings. Lastly, the Chapter 7 trustee, in her own dual adversary proceedings,[4] requests approval to use her strong-arm powers to avoid the belated recordation of the mortgages and to allow her to step into Green's shoes for the benefit of the general unsecured creditors.

After conducting a two-day trial and considering the evidence and positions of the parties, the Court concludes that Green's loan is usurious and unenforceable. Although this ruling renders the other issues moot, the Court does conclude, alternatively, that, if Green's loan *were* valid, (1) the debtors could not discharge their liability, (2) Green is entitled to *nunc pro tunc* approval of the recording of his mortgages, and (3) the trustee is not entitled to avoid the transfer.

Courts determining whether a loan is usurious must consider the specific facts and circumstances surrounding the transaction. The question of usury is a factual one courts must resolve by examining the substance of a transaction. <u>Beausejour Corp., N.V. v. Offshore Development Co., Inc.</u>, 802 F.2d 1319, 1320 (11th Cir. 1986). Here, although the parties gave very different versions of what occurred, they do agree that the saga started at a meeting in July or August 2005. Four people attended this meeting: Monte Green, Roderic Boling, David Smith, and Rich Gulash.

Monte Green is an experienced real estate developer of small retail centers who lives in Islamorada, Florida. He occasionally also lends monies to fund projects that cannot attract

---

[2] Adversary Proceeding Numbers 6-76 and 6-77. Green has dismissed a third count in the complaints filed in these adversary proceedings asserting that the debtors are not entitled to a discharge pursuant to 11 U.S.C. § 727(a)(4).

[3] Green's Motions for Relief from Stay and the debtors' responses are docketed as Document Numbers 14 and 25 in Anna's case and as Document Numbers 23 and 45 in Roderic's case.

[4] Adversary Proceedings Numbers 7-158 and 7-161.

traditional financing. In this case, Green and a fishing buddy pooled their monies to extend the loan to the debtors. Nothing in the record indicates Green is a regular lender; however, he is a sophisticated business person with an obvious knowledge of the law and commercial negotiations.

Green earlier had befriended a young neighbor, David Smith. Smith had spent several years in prison and, during one period, was a prison roommate with Roderic Boling, the debtor.[5] After prison, both Smith and Roderic worked with Rich Gulash in his business placing blue tarps on damaged roofs pursuant to a contract with the Federal Emergency Management Agency. In 2004, Gulash earned substantial monies in this business due to the numerous hurricanes hitting Florida that year, and, as the 2005 hurricane season started, he wanted to expand his business to other states, such as Mississippi and Louisiana. In order to expand, Gulash needed capital. Smith suggested approaching his former neighbor, Monte Green.

Roderic, the debtor, was interested in the blue tarp project because he likely saw it as a new scheme to get rich. Roderic, however, was never an owner or partner in any venture with Gulash. Nor was he ever an officer or director of any company engaged in placing tarps on damaged roofs.

In July or August 2005, Gulash, Smith, and Roderic met with Green at a restaurant to discuss their business plans and to ask for a $1 million loan.[6] Green said he was interested but only if the loan was secured by real estate with sufficient equity to justify the advance. The parties discussed a possible "bonus" of 25 percent to Green in exchange for quickly extending

---

[5] Roderic served approximately four years in Florida prisons for convictions of ten separate felonies between 1990 and 1993. (Green Exhibit No. 48, Question No. 12). Green was aware of Roderic's and David Smith's criminal history at all relevant times. Both Anna and Roderic also were later convicted of federal securities fraud for a stock fraud scheme they orchestrated in July through August 2004. (Green Exhibit Nos. 19, 20, 49 and 50).

[6] A general description of the business proposal Gulash made to FEMA in 2005 is contained in Green Exhibit Numbers 36 to 40.

the loan. Green contends the debtor offered the "bonus" but that it was not a requirement for the loan.

The debtors never explained why they agreed to assist Gulash in obtaining the loan from Green insofar as neither Roderic nor Anna had any ownership interest in Gulash's businesses— First Response Group, Inc. and T & R Quality Stucco of Central Florida, Inc. (Green Exhibit Nos. 46 and 47). Roderic did and may still work for First Response Group, Inc. and T & R Quality Stucco as Director of Sales and Marketing. (Green Exhibit No. 48, Questions 2 and 3). Anna had even less connection with the business insofar as she was divorced from Roderic at the time the loan issued. (Green Exhibit No. 5). Gulash must have promised the debtors a large reward of some sort to convince Green to extend the loan. Roderic did testify he expected to make "millions" from the roof protection jobs, but he never credibly explained why, as an employee, he would earn such largesse.

Nevertheless, by early September 2005, Green was sufficiently interested in making the loan and asked his lawyer, Bryan Levy, to draft the loan documents, including mortgages encumbering the debtors' two homes. Green continued to negotiate the terms of the loan with the other men, including Roderic. Levy had virtually no contact with the debtors, other than in connection with executing the loan documents. Neither Green nor Levy ever met Anna Boling.

For example, in mid-September, Roderic faxed a package of information relating to the value of one of the homes the debtors offered as collateral for Green's loan, the Tranquility Cove home, to Green, not to Levy. (Greens Exhibit No. 41). Roderic enclosed information on sales of comparable properties and valuation information from the property appraiser's office. Roderic, in his cover sheet, valued the home at $2,243,420, but stated: "Last year's estimate of $1.5

million is at the least conservative."[7]  In the end, Green relied on the property appraiser's value of $769,893 in making the loan, but this communication indicates that Green, not Levy, was working directly with Roderic shortly before the loan closed.

Levy drafted the loan documents as directed by Green. The majority of the documents were forms supplied by a title insurance company for use in a typical real estate closing.  For example, both debtors signed "form" Closing Affidavits indicating in paragraph 10 that there were no "judgments, bankruptcies, liens or executions of any nature which constitute or could constitute a charge or lien." (Green Exhibit Nos. 17 and 43).  The debtors said they never read these documents but merely signed the "forms" to induce Green to make the loan.  The debtors freely concede the affidavit was false because both debtors then had significant outstanding recorded judgments of approximately $2 million filed against them.[8]

One form, however, was not routine—the Promissory Note and Agreement for Return on Investment.  (Green Exhibit No. 16).  Green made a loan of $300,000 to the debtors, who are incorrectly referenced as "husband and wife," with interest to "accrue at the rate of EIGHTEEN percent (18%) per annum."   However, the note also provided in addition to the interest a substantial "return on investment," or as Green testified, a "bonus":

> Commencing on **December 26, 2005**, and continuing thereafter every 90 days, through and including **September 26, 2006**, quarterly payments of interest only in amount of **$13,500.00** each, shall be due and payable.  In addition, Borrower agrees to pay Lender an additional **$61,500.00** as a return on Lender's investment in <u>First Response Group, Inc.</u> ("Company") also to be paid in quarterly payments

---

[7]  Interestingly, Anna valued the Tranquility Cove home only a few days later at $900,000 in her bankruptcy schedules. (Green Exhibit No. 1, Schedule A.)  Roderic valued the same home at only $200,000 in his bankruptcy schedules. (Green Exhibit No. 24, Schedule A).

[8]  Some of the outstanding, recorded judgments or liens against one or both of the debtors include: (1)  Federal Tax Lien for 2001 and 2002 for $78,791.14; (2) Judgment of Wekiva Hunt Club Community Association, Inc. for $2,175; (3) Judgment of Amwest Surety & Casualty Company for $1,000; (4) Three judgments of the State of Florida for $295, $948, and $300; (5) Federal Tax Lien for 1999 and 2000 for $85,569.00; (6) Judgment of State Bank of Wheaton for $163,019.23; (7) Judgment of NEC Financial Services, Inc. for $28,554.43; (7) Judgment of Lyon Financial Services, Inc. for $74,313.34; (8) Judgment of Mortgage Electronic Registration Systems, Inc. for $189,380.14; and (9) Judgment of Metro North America, Ltd. for $1,676,13.66 (Green Exhibit Nos. 3,4, 26-35).

> commencing on January 26, 2006.   The entire unpaid
> principal balance of this Promissory Note, together with
> any unpaid interest accrued thereon, shall be due and
> payable on September 26, 2006 "Maturity Date") unless
> otherwise extended at Lender's sole option for additional
> periods of one (1) year each.   In the event Lender chooses
> to extend the maturity date, interest only payments,
> together with payments for return on Lender's investment
> shall continue each and every quarter.

The provisions for the accrual and payment of interest under the promissory note are clear.   Interest accrued at 18 percent per quarter, or $13,500, and was payable in quarterly payments starting on December 26, 2005, and was due in full on the maturity date, one year later, September 26, 2006.[9]   Total interest payable under the note, without extension, is $54,000, or exactly 18 percent.

Calculation of the "return on investment," however, is ambiguous.   First, the payment dates are distorted and not on a quarterly cycle.   The first payment date for the "return on investment" was January 26, 2006, more than one quarter after the note's execution, and a different date than the first quarterly interest payment was due.   Yet, presumably, the entire "return on investment" is payable at the maturity date.    Second, the "return on investment" provision requires the debtors to pay the amounts in perpetuity, in the event Green agreed to extend the maturity date for repayment.    Specifically, the last sentence requires continued "payments for return on Lender's investment" each and every quarter upon any extension of the maturity date.

Third, and most troubling, the note does not clearly define the amount of the "return on investment."   Was the amount of $61,500 to be divided into four quarterly payments of $15,374 each?   If so, the total "return on investment" was $61,500 per year, which, when added to the 18

---

[9] During trial, Green inexplicably continued to assert the note was for a short, 90-day period, in contradiction of the terms of the note itself.

percent interest ($54,000), would require the debtors to pay Green $115,500 ($54,000 + $61,500 = $115,500) for a loan of $300,000, resulting in an actual return of 38.5 percent.

Or, instead, were the debtors required to make a quarterly payment each in the amount of $61,500, resulting in a total payment of $246,000 per annum?  If so, the total "return on investment" was $246,000 per year, which, when added to the 18 percent interest ($54,000) would result in a 100 percent return ($54,000 + $246,000 = $300,000).

Green testified that the total return on investment was only $61,500 per year to be paid in four quarterly installments.  However, testimony by the debtors and his own lawyer contradicts Green.  Specifically, when the debtors missed the first quarterly payment of interest due on December 26, 2005, Levy sent the debtors a demand letter.  (Debtors' Exhibit No. 8).  In this letter, dated January 16, 2006, Levy demanded that the debtors remit a payment of $61,500 for one quarterly payment of the "return on investment," stating "Borrower is also required to remit a separate check, in the amount of $61,500, representing the return on Lender's investment," ignoring the fact that the first payment of the "return on investment" was not due until January 26, 2006.  The Court concludes that, to the extent that the "return on investment" is treated as interest on the loan, the return to Green was equivalent to 100 percent.

Green testified that the "return on investment" was more in the nature of a consulting agreement or bonus, not additional interest.  The third paragraph of the Promissory Note supports this testimony:

> Borrower hereby confirms that this Promissory Note evidences not only Lender's interest charge on the $300,000.00, but also evidences Borrower's and Lender's agreement for a return on lender's investment in Company. Borrower acknowledges that lender would not have loaned the aforementioned funds purely on the collateral described in that certain Mortgage, but rather is using the investment opportunity in Company as an incentive for the transaction described herein. *Borrower further acknowledges and hereby agrees that Lender's interest charge is separate and unrelated to the return on Lender's investment.* Lender's

return on his investment in Company shall not be interpreted
as accrued interest. (Emphasis added.)

However, all of the other testimony and circumstances surrounding this loan leads the Court to conclude that the "return on investment" was in actuality a subterfuge to disguise usurious interest. First, Green never made an investment in any "company." He loaned $300,000 to the debtors who were personally obligated to repay him, not any business. Second, he certainly never transferred or disbursed any monies to a company known as First Response Group, Inc. Third, Green, a strip retail center developer, has no expertise in protecting damaged roofs or obtaining FEMA contracts. He has no reason to act as a consultant. He simply had money, was willing to loan the money to a convicted felon, and demanded a return of 100 percent for the loan.

Green acknowledges that he knew Florida law limited legal interest on loans of this type to 18 percent. He argued that the borrowers, not he, required the inclusion of the "return on investment" language. The Court did not find this testimony credible. Green was the sole person negotiating the business terms of the loan. He dictated the amount of the loan and the terms of the loan. Green hired his own attorney, Levy, to draft the loan documents, including the promissory note with its penultimate paragraph containing an intended usury savings clause. Green knew that, in order to get a return of greater than 18 percent, he had to create the appearance of an alternative reason for the extra payments. He, perhaps with Levy's assistance, came up with the idea of a "return on investment." Therefore, considering that the "return on investment" was indeed a disguised form of interest, the total interest charged on Green's loan to the debtors was 100 percent per annum.

Levy had almost no contact with the debtors. He sent the proposed loan documents to Anna Boling via e-mail on the morning of September 28, 2005. (Debtors' Exhibit No. 2). His office sent a further Disbursement Instruction form to Anna later on the afternoon of the same

day. (Debtors' Exhibit No. 3). Sometime during the day, Levy had one or two short telephone conversations with Anna. He specifically directed her to back-date the signature block, if they wanted to get the monies without any further delay due to the applicable three-day rescission period. The Court makes no finding as to whether Green insisted on the back-dating of the loan documents or whether the debtors who, by their own testimony, wanted the funds immediately, decided to back date their signatures to eliminate any rescission period.

Anna promptly forwarded the documents to Roderic, who was working on roof protection in Mississippi following Hurricane Katrina's landfall on August 29, 2005. Roderic testified that Gulash had several crews working in the area and that he could not pay the workers without Green's loan. In any event, neither Roderic nor Anna read the documents before they signed them. They executed the documents on September 29, 2005, although all of the loan documents are dated three days earlier, September 26, 2005.

The following Monday, October 3, Levy transferred $300,000 to a company operated by Gulash, T & R Quality Stucco of Central Florida, Inc., pursuant to the debtors' disbursement instructions. (Green Exhibit Nos. 18 and 44). Levy's office then mailed the two mortgages to Seminole County for recordation. (Green Exhibit No. 15). The mortgages were not recorded until 2:59 p.m. on the afternoon of October 17. (Trustee's Exhibit No. 3).

In the meantime, on October 15 and unbeknownst to Green, the debtors filed these two related Chapter 7 bankruptcy cases, which they had been planning for some time. The debtors first consulted with Andy Baron, an Orlando bankruptcy lawyer, as early as February 2005. They proceeded to finalize their divorce on June 30, 2005. (Green Exhibit No. 5). The Final Judgment of Dissolution of Marriage in paragraph 23 specifically references the debtors' "upcoming bankruptcy proceeding." As such, the debtors planned to file bankruptcy long before Roderic requested a loan from Green in July or August 2005.

Neither debtor initially listed Monte Green as a creditor, although, on her Schedule H, Anna did list Roderic as a co-debtor on a debt due to a creditor listed as "Montegreen." (Green Exhibit No. 1). No address or other information was provided. While Roderic testified that he informed Green that he and Anna were planning to file for bankruptcy protection before Green funded the loan, Green denies this is true. The Court specifically finds that Roderic's testimony on this point is not credible and that Green did not learn of the bankruptcy until after the debtors missed their initial quarterly interest payment. Anna filed an amendment to her bankruptcy schedules to add Green on January 30, 2006. (Green Exhibit No. 2). Roderic added Green as a creditor in his bankruptcy schedules on February 13, 2006. (Green Exhibit No. 25).

## Green's Loan is Usurious and Unenforceable

In the debtors' two adversary proceedings against Green, they assert they are entitled to declaratory judgments (Count 1), that Green's mortgages against their homes are void and unenforceable because the note is a usurious contract containing an unlawful rate of interest in an amount so high that the transaction constitutes criminal usury (Count 2), and shylocking (Count 3). The debtors bear the burden of proof on the issue. Oregrund Ltd. Partnership v. Sheive, 873 So.2d 451, 455 (Fla. 5th Dist Ct. App. 2004) (citing Phillips v. Lindsay, 102 Fla. 935, 136 So. 666 (1931); Tucker v. Fouts, 73 Fla. 1215, 76 So. 130 (1917); Swanson v. Gulf West Intern. Corp., 429 So.2d 817 (Fla. 2nd Dist. Ct. App. 1983)).

In order to demonstrate usury, the debtors must prove the following four elements: (1) an express or implied loan; (2) a repayment requirement; (3) an agreement to pay interest in excess of the legal rate; and (4) a corrupt intent to take more than the legal rate for the money loaned. Oregrund Ltd. Partnership v. Sheive, 873 So.2d 451, 455-457 (Fla. 5th Dist Ct. App. 2004) (citing Party Yards, Inc. v. Templeton, 751 So.2d 121, 123 (Fla. 5th Dist Ct. App. 2000); Kraft v. Mason, 668 So.2d 679 (Fla. 4th Dist. Ct. App. 1996); Bermil Corp. v. Sawyer, 353 So.2d 579 (Fla. 3d Dist. Ct. App. 1978)). Here, there is no question that Green extended a loan to the

debtors or that the debtors personally had a repayment obligation to Green.  The only issue is whether the debtors were required to pay interest in excess of the legal rate and, if so, whether Green had a "corrupt intent" in requiring the usurious interest.

Chapter 687 of the Florida Statutes provides that any loan under $500,000[10] that imposes an interest rate of over 18 percent is usurious.[11]    The consequences of charging a usurious

---

[10] Loans in excess of $500,000 can charge a higher rate of interest, not to exceed the rates prescribed in Section 687.071. Florida Statute Section 687.02.

[11] As relevant, Sections 687.02, 687.03, 687.04, and 687.071 provide as follows:

**687.02. "Usurious contracts" defined**

(1) All contracts for the payment of interest upon any loan, advance of money, line of credit, or forbearance to enforce the collection of any debt, or upon any obligation whatever, at a higher rate of interest than the equivalent of 18 percent per annum simple interest are hereby declared usurious. However, if such loan, advance of money, line of credit, forbearance to enforce the collection of a debt, or obligation exceeds $500,000 in amount or value, then no contract to pay interest thereon is usurious unless the rate of interest exceeds the rate prescribed in s. 687.071.

. . .

West's F.S.A. § 687.02

**687.03. "Unlawful rates of interest" defined; proviso**

(1) Except as provided herein, it shall be usury and unlawful for any person, or for any agent, officer, or other representative of any person, to reserve, charge, or take for any loan, advance of money, line of credit, forbearance to enforce the collection of any sum of money, or other obligation a rate of interest greater than the equivalent of 18 percent per annum simple interest, either directly or indirectly, by way of commission for advances, discounts, or exchange, or by any contract, contrivance, or device whatever whereby the debtor is required or obligated to pay a sum of money greater than the actual principal sum received, together with interest at the rate of the equivalent of 18 percent per annum simple interest. However, if any loan, advance of money, line of credit, forbearance to enforce the collection of a debt, or obligation exceeds $500,000 in amount or value, it shall not be usury or unlawful to reserve, charge, or take interest thereon unless the rate of interest exceeds the rate prescribed in s. 687.071. The provisions of this section shall not apply to sales of bonds in excess of $100 and mortgages securing the same, or money loaned on bonds.

. . .

West's F.S.A. § 687.03

**687.04. Penalty for usury; not to apply in certain situations**

Any person, or any agent, officer, or other representative of any person, willfully violating the provisions of s. 687.03 shall forfeit the entire interest so charged, or contracted to be charged or reserved, and only the actual principal sum of such usurious contract can be enforced in any court in this state, either at law or in equity; and when said usurious interest is taken or reserved, or has been paid, then and in that event the person who has taken or reserved, or has been paid, either directly or indirectly, such usurious interest shall forfeit to the party from whom such usurious interest has been reserved, taken, or exacted in any way double the amount of interest so reserved, taken, or exacted.

. . .

West's F.S.A. § 687.04

interest rate increase dramatically as the interest rate increases.  Where a person willfully charges an effective rate of interest over 18 percent but not exceeding 25 percent, the lender forfeits the earned interest but can still recover the principal.  Fla. Stat. § 687.04. Loans charging effective interest rates exceeding 25 percent but less than 45 percent are deemed second degree misdemeanors, and loans charging effective interest rates exceeding 45 percent are deemed third degree felonies. Both such loans are unenforceable in Florida courts. Fla. Stat. §§ 687.071(2), (3), and (7).   The lender can recover neither interest nor principal on the loan, regardless of whether the loans are prosecuted criminally.   To further discourage usury, to the extent the lender actually collected any interest under a usurious loan, the borrower is entitled to recover double the amount of interest paid.  Fla. Stat. § 687.04.

Here, Green's loan bore an interest rate of 100 percent, well above any interest rate allowed under Florida law.  If Green made the loan with "corrupt intent," he is not entitled to payment of any interest or the repayment of any principal on the loan.  He also is subject to prosecution of a third degree felony, and, if the debtors had paid any interest, Green would have had to repay them double that amount.

---

**687.071. Criminal usury, loan sharking; shylocking**
. . .
(2) Unless otherwise specifically allowed by law, any person making an extension of credit to any person, who shall willfully and knowingly charge, take, or receive interest thereon at a rate exceeding 25 percent per annum but not in excess of 45 percent per annum, or the equivalent rate for a longer or shorter period of time, whether directly or indirectly, or conspires so to do, shall be guilty of a misdemeanor of the second degree, punishable as provided in s. 775.082 or s. 775.083.

(3) Unless otherwise specifically allowed by law, any person making an extension of credit to any person, who shall willfully and knowingly charge, take or receive interest thereon at a rate exceeding 45 percent per annum or the equivalent rate for a longer or shorter period of time, whether directly or indirectly or conspire so to do, shall be guilty of a felony of the third degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.
. . .
(7) No extension of credit made in violation of any of the provisions of this section shall be an enforceable debt in the courts of this state.

West's F.S.A. § 687.071.

The real factual issue then is whether Green extended the loan with the requisite "corrupt intent" to receive usurious interest at the time he executed the promissory note with the debtors. Kay v. Amendola, 129 So.2d 170, 174 (Fla. App. 1961) (intent/usury is determined at the inception of a transaction); First Mortg. Corp. of Vero Beach v. Stellmon, 170 So.2d 302, 305 (Fla. App. 1964) (same). In determining the presence of usury, courts must consider all of the circumstances surrounding a transaction elevating substance over form. Kay v. Amendola, 129 So.2d 170, 172 (Fla.App.1961). The purpose of Florida's usury statutes is to protect necessitous borrowers from the demands of avaricious lenders. Pushee v. Johnson, 123 Fla. 305, 166 So. 847 (1936). A thorough examination of the facts and circumstances surrounding a loan transaction permits courts to see through attempts to disguise or conceal usury. Pinchuck v. Canzoneri, 920 So.2d 713 (Fla. 4th Dist. Ct. App. 2006) ("the concealment of the needle of usury in a haystack of subterfuge will not avail to prevent its pricking the body of the law into action.") (quoting Kay v. Amendola, 129 So.2d 170, 173 (Fla.App.1961)).

In contemplating whether a transaction is usurious, courts can consider whether other amounts charged by a lender in connection with financing may be regarded as interest. "One does not have to specifically charge interest for there to be usury." Oregrund Ltd. Partnership v. Sheive, 873 So.2d 451, 455-457 (Fla. 5th Dist. Ct. App. 2004) (citing American Acceptance Corp. v. Schoenthaler, 391 F.2d 64 (5th Cir.1968) (Florida law)); Matter of Mickler, 50 B.R. 818, 829 (Bankr.M.D. Fla.1985) (a "bonus" exacted in connection with financing may be regarded as interest) (citing Conner Air Lines v. Aviation Credit Corp., 280 F.2d 895 (5th Cir. 1960)). Notwithstanding whether an amount charged in connection with a loan is labeled as interest or as something else, if the total amount exceeds the amount of interest permitted by law, a transaction possibly is usurious. A mathematical computation resulting in an interest rate exceeding 18 percent, standing alone, is not suffice to demonstrate usury. Mickler, 50 B.R. at 829 (citing Sharp v. Dixon, 252 So.2d 805 (Fla. 4th Dist. Ct. App. 1971). Rather, a party

objecting to a usurious loan must prove "corrupt intent" of the lender.  For example, loans involving a substantial degree of speculative risk "may require payment of a reasonable sum provided the requirement is based in good faith," and may not constitute a usurious loan. Diversified Enterprises, Inc. v. West, 141 So.2d 27 (Fla. Dist.Ct. App. 2d Dist. 1962). Usury is a fact based inquiry.

     In this case, the 18 percent interest specified in the promissory note was within the parameters permitted by Florida law. Green, as a sophisticated business person who had funded loans in the past, knew of Florida's statutory cap on interest.  Green, therefore, knew he needed to invent a justification to collect interest exceeding 18 percent if he wanted payment of his $246,000 "return on investment." The "return on investment" was merely a thinly veiled attempt to disguise the fact that Green was seeking to extract additional interest from the debtors in return for making the loan. Green did not make any investment in First Response Group, Inc. How can Green earn a "return" on an investment when he did not make the investment in the first place? Green did not establish any special business acumen in the roof protection field that would justify such an extraordinary return. There is simply no plausible explanation as to why the debtors would obligate themselves to pay a $246,000 return to Green for his "investment" in a company they did not own. Adding $246,000 to the allowed interest of $54,000 yields a return of 100 percent total interest. In extending the loan, Green was attempting to double his money in a year.

     At trial, Green tried to explain away the "return on investment" by claiming it was not his idea, rather, Roderic suggested the "bonus."   However, whether Roderic and not Green suggested the "bonus" is irrelevant.  A lender is not insulated from the laws of usury simply because the borrower offers to pay a usurious interest rate. Lee Const. Corp. v. Newman, 143 So.2d 222 (Fla. 3rd Dist. Ct. App. 1962) (a lender making a usurious loan is still subject to usury laws notwithstanding the fact that the borrowers suggested the plan to circumvent the usury

laws).  Green did not have any expertise to act as a consultant in connection with protecting damaged roofs or obtaining FEMA contracts. Although a lender legitimately may charge a fee for consulting or other services in addition to interest on financing, here, the Court does not find that explanation credible. Green's "consulting" services were not sought, required, or delivered. Rather, the purported "return on investment" was a transparent attempt to conceal "the needle of usury in a haystack of subterfuge." 129 So.2d at 173.

Green also cannot rely upon the usury savings clause in the promissory note. In Jersey Palm-Gross, Inc., v. Paper, 658 So.2d 531 (Fla. 1995), the Florida Supreme Court affirmed a trial court's findings of a lender's corrupt intent in extending a usurious loan on facts similar to those here and rejected the idea that a usury savings clause operates as an impenetrable defense to usury. In that case, partners in a real estate venture sought a loan. They already had obtained a loan from a traditional bank, but the amount loaned fell $200,000 short of the venture's needs. The partners/borrowers approached a private real estate developer, Walter Gross, and offered him equity in their partnership in exchange for a $200,000 investment. After reviewing the partnership's financial status, Gross initially declined to accept an equity position but did agree to loan $200,000 at a permissible interest rate of 15 percent. Shortly before the loan was to close, however, and having full knowledge of the borrowers' urgent funding needs, Gross demanded a 15 percent equity interest in the partnership as further consideration for making the loan. The borrowers, desperate for the funds, were in no position to seek funding elsewhere. They conceded to Gross' demands and gave him a 15 percent equity interest, the value of which, when added to the 15 percent interest on the loan, amounted to an interest rate of 45 percent per annum.

When Gross sued to enforce payment on the loan, the borrowers claimed that the loan was usurious and unenforceable. The trial court agreed, concluding that Gross had 'knowingly

and willingly'[12] charged usurious consideration in exchange for making the loan and ordered forfeiture of the entire principle amount pursuant to Florida Statute Section 687.071(7). Gross appealed and argued that the trial court failed to consider a usury savings clause. The appellate court upheld the trial court's finding of usury, holding that a usury savings clause was just one factor to consider in determining a lender's intent and that all of the circumstances of the transaction should be examined, explicitly "rejecting the use of a savings clause as an absolute bar to a usury claim." 658 So.2d 531, 535. The Florida Supreme Court agreed with appellate court's opinion that the loan made by Gross was usurious and that usury savings clauses are properly used and may be determinative of intent where the interest charged on a loan is close to the legal rate or where a transaction is not clearly usurious at inception but becomes so upon the happening of a future contingency, none of which were present. 658 So.2d at 535.

The circumstances in this case are similar to those in Jersey Palm-Gross. Here, Green charged $246,000, equal to 82 percent interest, in addition to the specified legal interest of 18 percent, or $54,000, on a plain vanilla loan involving no complicated mathematical calculations or any substantial degree of speculative risk, and he did so at a time the debtors were in no position to seek other funding and were desperate to obtain the loan. When the debtors executed the loan documents, crews were working to install tarps on roofs damaged by Hurricane Katrina. The workers would leave the job unless Green funded the loan and allowed payroll checks to issue. As was the case with the 15 percent equity interest demanded by Gross in Jersey Palm

---

[12] In Jersey Palm-Gross, 658 So.2d at 534, the Florida Supreme Court recited its definition of willful from its earlier case of Chandler v. Kendrick, 108 Fla. 450, 452, 146 So. 551, 552 (1933):

> A thing is willfully done when it proceeds from a conscious motion of the will, intending the result which actually comes to pass. It must be designed or intentional, and may be malicious, though not necessarily so. "Willful" is sometimes used in the sense of intentional, as distinguished from "accidental," and, when used in a statute affixing a punishment to acts done willfully, it may be restricted to such acts as are done with an unlawful intent.

<u>Gross</u>, the entire "return on investment" amount would have to be struck from Green's loan to bring the interest within the limits Florida law permits.

On these facts, the Court easily can conclude that the loan transaction was usurious and that Green simply sought to quickly double his money on a one-year loan to the debtors. He acted with a corrupt intent in extending the loan. The loan is not enforceable. No one, not even the Chapter 7 trustee, could step into Green's shoes to collect principle or interest on this loan. No award for double recovery is appropriate, however, because Green never received a single payment of interest or principle on the loan. As such, the Court will enter judgment in favor of the debtors and against Green in Adversary Proceeding Numbers 06-114 and 06-115, finding the loan is usurious and unenforceable for all purposes.

## Alternatively, if Green's Loan is Enforceable, the Debt is Not Dischargeable

Although Green's loan is usurious and not enforceable, if this ruling is later set aside, the Court alternatively will address Green's claims that the debtors cannot discharge the debt under Section 523(a)(2)(A) (Count 1) and (B) (Count 2) of the Bankruptcy Code.[13]  The primary purpose of bankruptcy law is to provide an honest debtor with a fresh start by relieving the burden of indebtedness. <u>Perez v. Campbell</u>, 402 U.S. 637 (1971); <u>In re Price</u>, 48 B.R. 211, 213 (Bankr. S.D. Fla. 1985); <u>Matter of Holwerda</u>, 29 B.R. 486, 489 (Bankr.M.D.Fla.1983). Exceptions to discharge are construed strictly against the creditor and liberally in favor of the debtor. <u>In re Cox</u>, 150 B.R. 807, 809 (Bankr.N.D.Fla.1992) (<u>citing</u> <u>In re Hunter</u>, 780 F.2d 1577, 1579 (11th Cir.1986); <u>Kiester v. Handy</u> (<u>In re Handy</u>) 164 B.R. 355 (Bankr. M.D. Fla. 1994)). The party objecting to the debtor's discharge has the burden of establishing that the debtor is not entitled to receive a discharge by the preponderance of the evidence. <u>Grogan v. Garner</u>, 498 U.S. 279 (1991) (Section 523 action); <u>In re Chalik</u>, 748 F.2d 616 (11th Cir. 1984) (burden on

---

[13] Unless otherwise stated, all references to the Bankruptcy Code refer to Title 11 of the United States Code.

objecting party); <u>In re Metz</u>, 150 B.R. 821 (Bankr.M.D.Fla.1993) (standard of proof is preponderance of the evidence). Accordingly, Green bears the burden of proving by a preponderance of the evidence that the monies owed to him by the debtors should be excepted from discharge pursuant to Bankruptcy Code Sections 523(a)(2)(A)[14] and (B).[15]

For all practical purposes, the requirements of Bankruptcy Code Sections 523(a)(2)(A) and (B) are similar. Both require a false representation made by the debtor with the intent to deceive a creditor, justifiable or reasonable reliance by the creditor upon the representation, and resulting damages. Section 523(a)(2)(A) requires that the creditor sustain a loss due to the misrepresentation, and Section 523(a)(2)(B) requires the misrepresentation to have been made in a writing representing the debtor's financial condition.

The debtors concede that the Closing Affidavits (Green Exhibit Nos. 17 and 43) contain written, material misrepresentations of their financial condition insofar as they stated their homes were "free and clear of all liens, taxes, encumbrances and claims of every kind, nature and description of record whatsoever, except for real estate and personal property taxes for the year 2005" and that they had no "judgments, bankruptcies, liens or executions of any nature which constitute or could constitute a lien."[16]  The debtors clearly were aware at the time they signed these affidavits that there were <u>multiple</u> outstanding recorded judgments and federal tax liens against them approximating $2 million. See n. 8, <u>supra</u>. A debtor's concealment or

---

[14] Specifically, pursuant to Section 523(a)(2)(A), a debtor cannot discharge a debt to the extent the debt is obtained by "false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." 11 U.S.C. § 523(a)(2)(A) (2008).  To establish fraud pursuant to Section 523(a)(2)(A), a plaintiff must prove: (1) the debtor made a false representation to deceive the creditor; (2) the creditor relied on the misrepresentation; (3) the reliance was justified; and (4) the creditor sustained a loss as a result of the misrepresentation. <u>SEC v. Bilzerian</u> (<u>In re Bilzerian</u>), 153 F.3d 1278, 1281 (11th Cir. 1998).

[15] Pursuant to Section 523(a)(2)(B), a debtor will not be permitted to except a debt from discharge if the plaintiff proves the debt was obtained by a statement in writing: (1) that is materially false; (2) representing the debtor's or an insider's financial condition; (3) upon which the creditor reasonably relied; and (4) the debtor caused the writing to be made or published with the intent to deceive. <u>Equitable Bank v. Miller</u> (<u>In re Miller</u>), 39 F.3d 301, 304 (11th Cir.1994). "Mere inaccuracy" will not suffice as material falsity. <u>Master Fin., Inc. v. DeJulio</u> (<u>In re DeJulio</u>), 322 B.R. 456, 461 (Bankr.M.D.Fla.2005).

[16] (Green Exhibit Nos. 17 and 43, ¶¶2 and 10).

understatement of liabilities is a material misstatement. <u>In re Copeland</u>, 291 B.R. 740, 782 (Bankr. E.D. Tenn. 2003) (internal quotations omitted).

The debtors clearly and intentionally misrepresented their financial picture with respect to the encumbrances on their homes and the outstanding judgments against them. The debtors made these affirmative misrepresentations with the intent to deceive Green and to induce him to extend the loan. Paragraph 12 of each of the Closing Affidavits indeed specifically states that the "affidavit is given for the purpose . . . of inducing Monte Green to make its loan in the amount of $300,000.00. . ."

The debtors' argument that they did not read the Closing Affidavits before signing them does not excuse their actions.  The debtors did not read the affidavits because they did not care what they said. The debtors had met with a bankruptcy attorney in February, obtained a divorce in June, and were simply waiting for Green to extend this loan in September, which they sought to discharge twelve days after the loan was funded when they filed these bankruptcy cases on October 15. The debtors never intended to repay this loan, and no credible evidence indicates Gulash or his companies intended to repay Green. The Closing Affidavits were signed under the penalty of perjury, and the debtors cannot disclaim any knowledge of the contents of those affidavits now. They intended to deceive Green.

The debtors now argue that Green should not have relied on the debtors' fraudulent Closing Affidavits but should have performed additional due diligence before making the loan. Green argues that both he and his attorney completed sufficient due diligence but that he would not have extended the loan without the representations in the Closing Affidavits. Here, the issue is whether Green should have ordered a credit search using the debtors' names. If he had done so, he would have learned of the multitude of judgments and liens outstanding against the debtors. Perhaps a bank or professional lender would have ordered such a search. Green, however, was not a full time financier. He had never lent monies to the debtors. He saw an

opportunity to extort a usurious interest rate at the same time the debtors saw an opportunity to scam Green. Both the debtors and Green were taking advantage of the other. Therefore, although a cautious, prudent bank likely would have ordered a credit report before making the loan, this is not your typical lending relationship. Green was entitled to reasonably rely on the debtors' written Closing Affidavits. The purpose of bankruptcy law is to assist an honest debtor, not to reward a dishonest debtor for fraudulent acts.

Even if the Court found that Green could not reasonably rely on the debtors' lies in the Closing Affidavits, the debt still is not dischargeable because the debtors entered into the loan with no intent to repay Green. Although Roderic testified he believed Gulash may repay Green, no credible evidence supports the belief. Gulash never had any legal obligation to repay Green. Rather, the debtors took Green's money knowing that they were filing bankruptcy in two weeks and that Green would never receive a single payment. Given the substantial tax liens and encumbrances on the debtors' homes, the debtors likely contemplated surrendering their homes in the context of their bankruptcy cases and knew, first, that Green's mortgages were subordinate to their existing mortgages and encumbrances, and, second, that Green's mortgages were irrelevant if they did in fact later surrender their homes. Given the extensive bankruptcy planning in the months prior to obtaining the loan and the ultimate bankruptcy filings by the debtors approximately two weeks afterwards, the Court finds that the debtors lacked any intent to repay the loan when it was made. They essentially stole the money from Green. Lastly, for purposes of Bankruptcy Code Section 523(a)(2)(A), it is not disputed that Green sustained a loss due to the debtors' misrepresentations in that he has not been repaid a single dollar on his loan.

Therefore, if the loan later is deemed enforceable, the debtors are liable for repayment and cannot discharge the debt pursuant to Bankruptcy Code Sections 523(a)(2)(A) and (B). Judgment shall be entered in favor of Green and against the debtors in Adversary Proceedings 6-

76 and 6-77, finding that if Green's loan is ever deemed enforceable, the debt is not dischargeable.

### Alternatively, if the Loan is Enforceable, Green is Entitled to Modify the Automatic Stay to Allow the *Nunc Pro Tunc* Recording of the Mortgages

If, alternatively, Green's loan later is determined to be enforceable by a reviewing court, he is entitled to the benefit of a timely recording of his mortgages. Green funded the loan to the debtors on October 3, 2005. His attorney contemporaneously sent the mortgages to Seminole County for recording on or about that same day. Whether due to a delay in the mail or with the recording officials in Seminole County, the mortgages were not recorded until 2:59 on the afternoon of October 17, 2005, two days after the debtors filed bankruptcy. Green was not aware of the bankruptcy until several months later in January 2006. He now asks the Court to give *nunc pro tunc* effect to the recording of the mortgages, treating them as if they were filed prior to the debtors' bankruptcy petitions.

Filing a bankruptcy petition triggers two operations of law. First, an estate is created consisting of all of a debtor's legal or equitable interests in property as of the petition date. In re Santangelo, 325 B.R. 874, 880 (Bankr. M.D. Fla. 2005) (citing 11 U.S.C. §541(a)). Second, the automatic stay takes effect and precludes any act to create, perfect, or enforce any lien against property of the estate. 11 U.S.C. §362(a)(4). Actions taken in violation of the automatic stay are void. In re Albany Partners, Ltd., 749 F.2d 670, 675 (11th Cir. 1984). However, in limited and compelling circumstances, Bankruptcy Code Section 362(d) permits bankruptcy courts to grant retroactive or "nunc pro tunc" relief from the automatic stay to validate actions taken post-petition. Albany Partners, 749 F.2d at 675; In re Barr, 318 B.R. 592, 598 (Bankr. M.D.Fla. 2004).

In determining whether circumstances are sufficiently compelling to warrant retroactive annulment of the stay, courts have considered (1) whether the creditor had actual or constructive

knowledge of the bankruptcy filing, (2) whether the debtor acted in bad faith, (3) whether grounds would have existed for modification of the stay if a motion had been filed before the violation, (4) whether the denial of retroactive relief would result in unnecessary expense to the creditor, and (5) whether the creditor has detrimentally changed its position on the basis of the action taken. In re Barr, 318 B.R. 592, 598 (Bankr.M.D.Fla.2004) (citing In re Stockwell, 262 B.R. 275, 281 (Bankr. D.Vt. 2001). Courts also look at whether a debtor has equity in the property and, in reorganization cases, whether the property is necessary to an effective reorganization. Stockwell, 262 B.R. at 281. A debtor's actions and lack of good faith are considered in evaluating whether retroactive relief is warranted. In re Webb, 294 B.R. 850, 853 (Bankr. E.D. Ark. 2003). Examples of cases where courts found sufficiently compelling circumstances to retroactively lift, or annul, the automatic stay to validate a post-petition action include In re Stockwell, 262 B.R. 275 (Bankr. D. Vt. 2001) (recording foreclosure judgment post-petition did not violate automatic stay); In re Barr, 318 B.R. 592 (Bankr M.D. Fla. 2004) (post-petition judgment ratified), and In re Syed, 238 B.R. 126 (Bankr. N.D. Ill. 1999) (post-petition foreclosure sale confirmed).

In the event Green's loan is later deemed enforceable and not usurious, the Court finds that Green is entitled to *nunc pro tunc* relief from the automatic stay to validate the post-petition recording of his mortgage encumbering the debtors' homes. Green attempted to record the mortgages contemporaneously with the funding of the loan. He had no actual or constructive notice that the debtors had filed for bankruptcy protection until months later, after the debtors failed to make the first payment on his loan. The debtors certainly acted in bad faith as to Green. They got $300,000 from him on October 3, filed bankruptcy on October 15 and did not tell Green about the bankruptcy until January or February 2006, months later.

Moreover, when a creditor diligently and timely acts to record a security interest but is thwarted by the debtor's intervening bankruptcy, the Court routinely finds sufficient grounds or

"cause" to lift the stay. The automatic stay can be lifted if an interested party demonstrates "cause." See 11 U.S.C. §362(d)(1). In this case, the circumstances are sufficiently compelling to constitute adequate cause to lift the stay and to retroactively validate the post petition recording of Green's mortgages against the debtors' homes. Green's motions for relief from stay are contingently granted, in the event his loan to the debtors is ever deemed enforceable.

### Trustee is Not Entitled to Benefit from Green's Loan

The trustee lastly seeks to avoid and recover Green's mortgage interest in the debtors' homes pursuant to Bankruptcy Code Sections 544(a)(3)[17] and 550[18] (Count 1) and to preserve Green's interest for the benefit of the estate pursuant to Bankruptcy Code Section 551[19] (Count 2). However, the trustee cannot prevail under either count. First, the Court has concluded that Green's loan to the debtors was usurious and unenforceable. The trustee cannot enforce a usurious loan. Second, notwithstanding the Court's ruling that the loan is unenforceable, to the extent this ruling is overturned on an appeal of the issue, the Court has granted Green's motion

---

[17] Section 544(a)(3) of the Bankruptcy Code provides what are commonly referred to as the trustee's "strong arm powers" and states:

> (a) The trustee shall have, as of the commencement of the case, and without regard to any knowledge of the trustee or of any creditor, the rights and powers of, or may avoid any transfer of property of the debtor or any obligation incurred by the debtor that is voidable by—
>
> ***
>
> (3) a bona fide purchaser of real property, other than fixtures, from the debtor, against whom applicable law permits such transfer to be perfected, that obtains the status of a bona fide purchaser and has perfected such transfer at the time of the commencement of the case, whether or not such a purchaser exists.

11 U.S.C. § 544(a)(3).

[18] Bankruptcy Code Section 550, titled "Liability of transferee of avoided transfer" relevantly provides that, subject to certain exceptions, to the extent a transfer is avoided under Section 544, "the trustee may recover, for the benefit of the estate, the property transferred or the value of such property from the initial transferee, or the immediate or mediate transferee of such initial transferee. 11 U.S.C. §§ 550(a)(1) and (2).

[19] As relevant, Bankruptcy Code Section 551, titled "Automatic preservation of avoided transfer," simply provides that any transfer avoided under Section 544 "is preserved for the benefit of the estate but only with respect to property of the estate." 11 U.S.C. § 551.

seeking *nunc pro tunc* relief from the automatic stay to validate the post-petition recording of his mortgages in the debtors' homes.  Therefore, even if the loan is deemed enforceable by another court, the mortgages are deemed recorded pre-petition, and Green holds a perfected secured position that the trustee cannot avoid under Section 544(a)(3).

A judgment will be entered in favor of Green and against the trustee in Adversary Proceedings 7-158 and 7-161.  Separate judgments and orders consistent with this Memorandum Opinion shall be entered.

DONE AND ORDERED on July 24, 2008.

_____
KAREN S. JENNEMANN
United States Bankruptcy Judge

Copies furnished to:

Debtor:  Anna August Boling, 205 Tranquility Cove, Altamonte Springs, FL  32701

Debtor:  Roderic Lee Boling, 121 Stag Ridge Court, Longwood, FL  32779

Attorney for debtors/defendant:  Kenneth D. Herron, Jr., Wolff, Hill, McFarlin & Herron, P.A., 1851 W. Colonial Drive, Orlando, FL  32804

Attorney for debtors/defendant:  Andrew C. Baron, Esq., Law Offices of Andrew Baron, 1803 E. Kaley Street, Orlando, FL  32806

Marie E. Henkel, Trustee, 3560 S. Magnolia Avenue, Orlando, FL  32806

Attorney for Trustee:  Sean D. Concannon, LS Concannon PA, P.O. Box 915875, Longwood, FL 32791

United States Trustee, 135 W. Central Blvd., Suite 620, Orlando, FL  32801

Plaintiff:  Monte Green:  c/o John L. Urban, Esq., Urban & Their, P.A., 545 Delaney Avenue, Suite 7, Orlando, FL  32801

Attorney for Plaintiff:  John L. Urban, Esq., Urban & Their, P.A., 545 Delaney Avenue, Suite 7, Orlando, FL  32801